44009. RESOLUTE INSURANCE COMPANY et al.
v. NORBO TRADING CORPORATION.
44010. WOHLMUTH v. NORBO TRADING
CORPORATION.

ARGUED NOVEMBER 6, 1968—DECIDED DECEMBER 2, 1968.

738

*Heyman & Sizemore, Joseph Lefkoff, Garvey, Colleran & Weiner, Dennis N. Garvey, Joseph B. Bergen,* for appellants.

*John R. Calhoun, Crawford, Leeb & Calhoun, Ralph L. Crawford,* for appellee.

DEEN, Judge. 1. As stated, Norbo has filed in support of its own motion for summary judgment and in opposition to that of the opposing parties, an affidavit signed by Emil Tucker the language of which, with paragraph numbers eliminated, is identical with the allegations of the petition. Resolute Insurance Company, on the other hand, in addition to Charles Leick's affidavit attached to its motion, took various interrogatories and the depositions of some 30 parties primarily concerned in the pertinent transactions. The Norbo document, considered as a petition, states a cause of action. *Norbo Trading Corp. v. Resolute Ins. Co.,* 115 Ga. App. 490, supra. The only issue here is whether, considered as an affidavit in opposition to a motion for summary judgment, it raises a jury question as to any of the tortious acts alleged therein in the face of the evidence produced by the defendant's documents and depositions which run to over 2,000 pages.

There is in fact some doubt as to whether the Tucker affidavit should be considered at all. As stated in *Crutcher v. Crawford Land Co.,* 220 Ga. 298 (3) (138 SE2d 580), pleading

allegations, although verified, are not alone sufficient to create a jury issue when opposed by factual affidavits. "We believe the Act was clearly intended to dispose of litigation expeditiously and avoid useless time and expense to go through a jury trial even though the petition fairly bristles with serious allegations, if when given notice and an opportunity to produce affidavits by persons competent to testify on their own knowledge to the truth of such allegations the pleader does nothing to contradict the affidavits of the movant which show there is no right of the opposite party to prevail. It is one thing to make wide general sweeping allegations in a petition, but quite another to testify of one's own knowledge to the existence or non-existence of a fact." Id., pp. 303, 304. As pointed out (p. 302) the Act (*Code Ann.* § 110-1205) "requires that opposing and supporting affidavits 'be made on personal knowledge,' and 'shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" This affidavit nowhere states that it is made on the personal knowledge of the affiant, and thus may be insufficient for any purpose, but in view of the seriousness of this litigation we have determined to examine its allegations (which coincide exactly with the allegations of the petition in one case and the answer in the other), and to accept the statements contained therein where (1) they would have genuine probative value if Tucker were testifying; (2) they are not inadmissible as conclusions and (3) it appears that they are in fact within the knowledge of the affiant, even though he has made no statement to this effect. "While the affidavit is no place for ultimate facts and conclusions of law, the court may disregard the conclusions of law and consider the rest of the affidavit. . . The policy of *Code Ann.* § 110-1205 is to allow the affidavit to contain all evidentiary matter, which, if the affiant were in court and testifying on the witness stand, would be admissible under the rules of evidence as part of his testimony." *Planters Rural Telephone Co-op. v. Chance,* 108 Ga. App. 146, 147 (132 SE2d 90). Bare legal conclusions in affidavits create no issue of fact on motion for summary judgment. *Benefield v. Malone,* 112 Ga. App. 408 (2) (145

SE2d 732); *Cooper v. Brock,* 117 Ga. App. 501 (3) (161 SE2d 75); *Bowen v. Consolidated Mortg. &c. Corp.,* 115 Ga. App. 874 (156 SE2d 168).

(a) Tucker's general statement in the pleadings as copied in the affidavit that Norbo Trading Corp. was not in default when the consent order of May 14 was signed is conclusively disproved by depositions of the following creditors or their officers which establish: (Myron Doty, Chief, Disposal Branch, U. S. Maritime Administration) delivery was not taken on any of the four ships at the time specified in the contracts, as a result of which demurrage charges piled up which had to be paid by Resolute on June 17, 1965, and represented a loss on the bonds, and the U. S. Maritime Administration notified the bonding company prior to the takeover that it was looking to the bonds for payment; (McGowan, Executive Secretary, Savannah District Authority) Norbo was in default in rental payments in March, April and May, 1965; (Williams, President, Gulf Atlantic Towing Co.) Norbo owed $16,725.86 for towing charges, part of which was recovered in February, 1965, by an attachment proceeding: (Spencer, General Manager, Atlantic Towing Co.) $2,700 was owing on towing charges for which this company was forced to file suit; (W. A. Porter, President, Porter Trucking Co., Porter Equip. Rental, Porter-Huggins, Inc.) operations of these compaines in preparing the shipyard for the use cost these companies a loss of $24,550.44 in unpaid contractual obligations between February 1 and May 14, 1965, and while some other bills were paid, all were paid late; (P. E. Clifton, President, Kay C. Co.) Norbo and its subsidiary American Salvage during this period made late payments, paid with bad checks, and ultimately defaulted in the sum of $5,460; (Gignilliat, Savannah Electric & Power Co.) Norbo defaulted on electric bills in the amount of $470.89; (Davis, Southern Bell Tel. & Tel. Co.) Norbo defaulted in the sum of $1,468.26 on telephone bills; (Henkel, Manger Hotel, Savannah) between February and May, 1965, Norbo incurred a $1,684 debt for hotel bills which was never paid; (Mears, Atlantic Coast Line R. Co.) between April 23 and May 11, $2,937.33 worth of freight bills were in default; (Nussbaum & Bell, Savannah Bank &

Trust Co.) the payroll account in this bank, which was in the name of American Salvage Company, was closed by the bank on May 11, 1965, because of overdrafts dating back to March 15, as well as a long list of checks returned for insufficient funds, running from small amounts for payroll to $52,000 to Bergen as trustee for Resolute. There were other creditors' depositions in the same vein. Tucker, in the depositions taken by the defendants, denied some of the statements but in general said he "did not recall" how much was owing. His own statements in large measure supported the proposition that Norbo and American Salvage were in default on substantially all their contractual obligations, that most payroll checks issued for the two weeks prior to the consent order had been returned marked insufficient funds, and that the Norbo account in the Meadowbrook National Bank in New York had only about $3,000. The payroll account alone was running between $6,000 and $9,000 per week. The evidence in the mass of interrogatories, depositions and affidavits demands a finding that agreements with the bonding company were in default; that contract dates for delivery of scrap iron had been breached resulting in an agreement by Nissho American Trading Corp. to continue to accept salvaged scrap iron only at a reduced price, which agreement was made without notice to Resolute and which increased its risk on the total enterprise and that the corporation was in default in payment of labor, material, supplies and rent, all of which impeded the completion of its contracts.

(b) Some of the more serious allegations of the petition and affidavit were to the effect that the defendants Wohlmuth, Leick, Resolute and Bergen as trustee for Resolute in managing the salvaging activities of Southeastern Ship Salvage Corp. after the issuance of the consent order conspired together and did in fact move the fourth ship, John S. Milledge and proceed with dismantling operations on it without authority, it being contended that the power of attorney conveyed to Wohlmuth concerned only the first three ships. In holding that the Norbo petition stated a claim this court said: "The petition does not show on its face that the handling of the fourth ship purchased by plaintiff was included in the power of attorney shown in the

petition." *Norbo Trading Corp. v. Resolute Ins. Co.,* 115 Ga. App. 490, 499, supra. It now appears conclusively that the U. S. Maritime Commission opened bids for all ships on January 12, 1965, and that the S. S. John Milledge was awarded with the other ships to Norbo on January 12, 1965. As stated before, the power of attorney was dated January 25, and included ratification of the purchase of Liberty ships as per a board of directors meeting of the same date. These minutes were not available as Tucker testified that he had lost them, and there was a dispute over whether the unsigned copy in the possession of Resolute, and which referred to the purchase of *four* ships, was in fact a true copy, but the U. S. Maritime Commission records show that there were four ships, including the Milledge, sold prior to the signing of the power of attorney. Also, negotiations for the sale of scrap from the Milledge to Claster were in progress at that time and the exact date of the contract is in dispute, but Claster Company issued its purchase confirmation on February 5. Purchase of the S.S. Milledge was specifically provided for in the loan agreement of Afghan American Trading Co., Inc. Tucker also, on February 17, delivered a sworn financing statement to Afghan which among other things stated that Norbo was in the process of purchasing four ships, one of which was specifically identified as the Milledge. Payment for the Milledge which had been promised on February 3 was not made until May 7, except for $574 paid on February 2 and $20,526 paid on March 7. Norbo dispatched a tug under a towing contract to pick up the Milledge on February 15, and the government refused to release the ship at that time because the purchase price had not been paid. Demurrage accumulated as a result of this default. Resolute Insurance Company was of course on the purchase, performance and financial guarantee bonds for the S. S. John Milledge in the same manner as on the other ships, the Wohlmuth power of attorney was coupled with an interest in consideration of Resolute Insurance Company providing surety bonds in the sum of $400,000, and it appears that $80,000 of this $400,000 is represented by the bond covering the loan in this amount from Case Press for the purchase of the Milledge. The S. S. John Milledge was mentioned in the plead-

ings in the original case; the consent order referred to the dismantling and salvaging of the "foregoing ships" and it does not appear that any question as to the right of the defendants to include operations relating to this ship along with the others in the leased facilities turned over to them for this purpose was ever raised until after the filing of this litigation. Resolute Insurance Company, by reason of its surety bond, was also given authority to take action in regard to the Milledge both in the ship mortgage executed to Resolute and Case Press and the loan agreement with Case Press, and a security agreement dated March 24 in which Norbo reconveyed its interest in the Milledge to Resolute to secure the $80,000 due Case Press. From all of the evidence it must be said that any conspiracy allegations regarding lack of authority to salvage and dismantle this ship constitute a sham defense.

(c) The same is true regarding the conspiracy allegations that the defendants transferred money out of and refused to deposit money in the Savannah Bank & Trust Company account for the purpose of preventing rent and payroll from being paid so that the Norbo operation could be closed down. On the contrary, it appears that Case Press advanced $80,000 of which $34,000 was used to pay the Maritime Commission for the S.S. Milledge, and the balance of which was deposited in Meadowbrook National Bank in New Jersey. At this time, following an agreement entered into on March 24 under which Bergen's trustee account for Resolute had been opened in Savannah subsequently to discovery that excess materials not involved in the two major contracts were disappearing or being sold and that the proceeds were not accounted for, the transfer of the supposedly remaining $46,000 to Savannah failed because Tucker had given his New York attorney, Friedman, a note and check for $15,000 for legal services; the check was returned marked insufficient funds and Friedman then placed the note for collection in the Meadowbrook National Bank, received the $15,000, and this caused the check to the Savannah bank to be returned for insufficient funds. After more incidents of the same kind Bergen, as trustee, received a part of the money and Friedman relinquished $10,000 of the $15,000 which was deposited to the

new account under Wohlmuth's direction. Friedman, the New York attorney for Tucker and Norbo, and Spence Grayson, the Savannah attorney for American Salvage who was also looking after Norbo's interest, testified that no commitments were made to place this money in the Norbo rather than the trustee account, or that the defendants would commit new funds to the enterprise which would increase their own considerable liabilities at this point. In the meantime, the Savannah Bank & Trust Company closed out the American Salvage Company account which was under the control of Tucker on May 7 following the return of 16 checks for insufficient funds on April 14, 12 on the 21st, 18 on the 22nd, 4 on the 23rd, 8 on the 26th, 5 on the 28th, 7 on the 29th, 38 on May 4, 15 on May 10 and 49 on May 11 prior to the consent decree of May 14. Sorrentino, the president of American Salvage Company and apparently the only person primarily involved in Tucker's organization with experience and standing in the ship salvaging business, had withdrawn in March following his discovery of numerous irregularities and bad business practices. Disregarding for the moment the depositions of the defendants, disinterested employees, creditors, banking officials, and the Maritime Commission officials, the depositions of Tucker's own attorneys in New York and Savannah and his partner Sorrentino are replete with factual material all of which was known to Norbo at the time the motions for summary judgment were filed and none of which is contradicted therein. Depositions and exhibits of all bank accounts involved in these transactions conclusively account for all money received and show its withdrawal for proper purposes. It is therefore obvious that the allegations and general statements in the affidavit of Tucker that the defendants acted wilfully and in bad faith for the purpose of causing the Norbo enterprise to fail are entirely without evidentiary foundation.

2. An agreement giving a surety the right to protect its interests by taking over its principal's obligations is not a violation of law or contrary to public policy, and the basic issue is whether the acts of the surety under these circumstances are in good faith for the protection of its interests. Seaboard Surety Co. v. Dale Construction Co., 230 F2d 625. A conspiracy is a

combination either to accomplish an unlawful end or to accomplish a lawful end by unlawful and tortious means. *Oxford Chemical Corp. v. Detrex Chemical Industries,* 217 Ga. 126 (121 SE2d 130). While the allegations in the petition were sufficient to set out a cause of action based on torts committed in the course of a conspiracy by the surety company and its agents to destroy the plaintiff's business, the uncontradicted factual statements contained in these lengthy depositions establish conclusively that Resolute Insurance Company and its attorney, bonding manager and general agent (all of whom were heavy financial losers as the result of the manner in which Norbo Trading Corp. conducted its business) acted in a businesslike and good-faith endeavor to cut their own losses and those of other creditors, which action would of course in the long run inure primarily to the benefit of Norbo if they were successful. There is no contention that any fraud was committed by Wohlmuth or any other of the defendants prior to the consent decree of May 14 turning over the salvaging operations to them which was unknown to plaintiff at the time of the consent judgment. We do not need to go back of this time point except for the purpose of establishing that Norbo had in fact defaulted so as to bring into play the powers given Wohlmuth by contract and ratified by the consent decree of that date. All prior agreements and controversies between the parties are merged in the consent decree. *Goolsby v. Goolsby,* 146 Ga. 763 (92 SE 521). There is no contention that it was obtained by fraud, accident or mistake, in which connection see *Driver v. Wood,* 114 Ga. 296 (40 SE 257); *Grayson v. Grayson,* 217 Ga. 133 (121 SE2d 34). Further, the sweeping conclusory charges of the Tucker affidavit which alone was interposed against this wealth of factual information already accumulated and on record in the case fail to measure up to the requirements of *Code Ann.* § 81A-156 by setting forth such facts as would be admissible in evidence to show that they are in good faith controverted. The actual fact was that Resolute Insurance Corp. was forced to pay out $328,000 in bond liabilities due to the defaults of Norbo Trading Corp. This disposes of all conspiracy allegations against the defendants.

3. There remain the allegations of Paragraph 17 that Wohl-

muth converted $13,000 of plaintiff's money to his own use, construed in *Norbo Trading Corp. v. Resolute Ins. Co.,* 115 Ga. App. 490, supra, p. 498, as being an allegation of tort against Wohlmuth alone. It is clear from the evidence on file and the lack of any factual information in Tucker's affidavit supporting this allegation that the sums referred to are the $10,000 refunded by Friedman and the $3,092.84 left in the Manhattan Bank which was eventually sent to Savannah when the account was closed out; that this money went to the account of Wohlmuth as attorney in fact for Norbo Trading Corp. and was used to cover payroll and like checks which had been returned from the Norbo account because of insufficient funds. If we are wrong in this and the allegation is intended to refer to some other activity, neither the time, place or circumstances are sufficiently identified to give the statement any probative value.

The petition as a whole and the affidavit as a duplication of the petition basically contend that Norbo's bonding company and certain individuals consipred together to force it to breach its various contracts so that they could take over the business and thereby make a profit. These allegations are totally unsubstantiated by factual proof. On the contrary, these defendants, acting under a power of attorney voluntarily given and a decree of the court based on the voluntary consent of the parties made a good-faith effort to salvage the enterprise.

When it eventually became evident that further efforts to salvage the ships would only increase the bond liability of Resolute Insurance Company, the mortgagee lenders and the surety company brought the foreclosure proceedings in a proper exercise of their legal rights as shown by the fact that Norbo Trading Corp. unsuccessfully contested the proceedings in a court action.

The trial court erred in denying the motions for summary judgment.

*Judgments reversed. Jordan, P. J., and Pannell, J., concur.*